# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

RENEE CLEMENS,

      Plaintiff,

                              Case No. 16-11444

v.                            HON. DENISE PAGE HOOD

MOUNT CLEMENS COMMUNITY
SCHOOL DISTRICT; WILLIAM A.
PEARSON; MOUNT CLEMENS
COMMUNITY SCHOOLS BOARD OF
TRUSTEES; JASON MONK; EDWARD
BRULEY; GLENN VOORHESS; JEANINE
WALKER; EARL RICKMAN, III; and
DAVID McFADDEN,

      Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [#49]

## I.    INTRODUCTION

Plaintiff was employed by Mount Clemens Community School District (the "District") for 30 years, including as an Assistant Superintendent from 2013-2016, before her employment was terminated. Plaintiff filed a five-count Complaint against Defendants, including claims for: (1) violation of her First Amendment freedom of speech and association rights under 42 U.S.C. § 1983 and the Michigan Constitution

1

(Counts I and II); (2) conspiracy to intimidate a witness, in violation of 42 U.S.C. § 1985 (Count III); (3) violation of the Michigan Whistleblowers' Protection Act, M.C.L. § 15.361 *et seq.* ("WPA") (Count IV); and (4) wrongful discharge in violation of Michigan public policy (Count V). Defendants have filed a Motion for Summary Judgment, and the Motion has been fully briefed. For the reasons set forth below, the Court grants in part and denies in part the Motion.

## II.     BACKGROUND

Plaintiff began working for the District in 1986 as a teacher. In the 2012/2013 school year, after 26 years as a teacher, she became a "Special Assistant to the Superintendent." The Superintendent of the District was Deborah Wahlstrom ("Wahlstrom"). For the 2013/2014 school year, Plaintiff was hired as one of the two Assistant Superintendents for the District, a position she also held for the 2014/2015 and 2015/2016 school years. As Assistant Superintendent, Plaintiff's duties included being in charge of the homeless student population, staffing, curriculum, professional development, school improvement interventions, School Improvement Grants ("SIG"), and applying for other grants and awards to obtain funds for the District acting as the clerk for the Board of Trustees of the District (the "Board"). Plaintiff represents that she was the ultimate supervisor of the special education department (30-40% of students in the District), which was the source of a significant amount of

funding for the District from the State of Michigan. According to District documents, 40% of Plaintiff's duties were attributable to curriculum and instruction, 35% to development coordinator, and 25% to school improvement interventions coordinator.

On or about April 13, 2015, Wahlstrom ("Wahlstrom") received an anonymous letter jointly addressed to her, the Board, the "Mount Clemens High School Administration," and Mitch Hotts ("Hotts"), a reporter for the Macomb Daily newspaper. That letter sought to "expose some unethical and illegal practices that are taking place at Mount Clemens High School," which allegedly included Defendant Jason Monk's management of the Mount Clemens Athletic Booster Club ("Booster Club"), his selling of food from his own restaurant at sporting events under the guise of raising money for the Booster Club, his lack of a permit or license from the City of Mount Clemens or its Health Department to sell such food, and various other allegations of conflicts of interest and nepotism related to Defendant Monk's coaching the high school girls' volleyball and basketball teams (collectively, the "Anonymous Allegations").

A sealed copy of the Anonymous Allegations was placed on each Board member's chair prior to the start of the April 15, 2015 Board meeting. None of the Defendants (or other non-Defendant Board members) looked into the Anonymous Allegations. On May 12, 2015, Wahlstrom met with Defendant Board members

Bruley, Monk, and Voorhess and discussed, among other things, the Board goals on which Wahlstrom was to be evaluated. At the May 20, 2015 Board meeting, Defendant Monk thanked a number of people, including Wahlstrom. The Anonymous Allegations were not mentioned.

On June 16, 2015, Wahlstrom participated in a conference call with Plaintiff, Teresa Davis (the other Assistant Superintendent in the District at that time), and Defendant Monk. The call pertained to the Anonymous Allegations, and during this conversation, Defendant Monk indicated that he felt that "it was a personal attack because [he] was a public figure." Dkt. No. 61-6, PgID 1484 (Page 121:19-21). The same day (June 16, 2015), Wahlstrom, Plaintiff, and Teresa Davis contacted the Macomb County Sheriff's Department ("Sheriff's Department") and the State of Michigan Attorney General's Office ("Attorney General") about the Anonymous Allegations for the first time. They reported to the Sheriff's Department a complaint of embezzlement and a deputy came to the high school to take a statement, which was forwarded to Detective Sergeant Stacy O'Brien to investigate. Plaintiff subsequently spoke on the phone to Detective O'Brien about the investigation on at least two occasions.

At a Board meeting on June 17, 2015, Defendant Monk stated, in part:

Final note: I was elected not to be a rubber stamp. To assure this district gets it right. Being uncomfortable is good. I will support what is right.

4

> I will challenge what needs fixing. Outside of attacks on myself, I will
> maintain professionalism.

Dkt. No. 61-18, PgID 1719. On June 18, 2015, Wahlstrom and Defendant Earl

Rickman, III (the President of the Board) sent a letter to Defendant Monk, advising

him that they had begun the investigations with the Sheriff's Department and the

Attorney General, as well as advising him that the Board had not authorized him to

fundraise on behalf of the District and to cease any such efforts, including the use of

the District's name, logo, symbols or likenesses in fundraising. In response,

Defendant Monk denied any wrongdoing and stated:

> Let me conclude by stating that the approach taken with this inquiry is
> troubling, as it is an apparent personal attack. I have always been readily
> accessible and would have been willing and able to allay any concerns
> without need for the threatening undertone of your correspondence
> which, to me, borders on defamation. It questions my integrity and
> generates unwarranted "water cooler" discussions about a respected
> member of the School Board and a longstanding supporter of Mount
> Clemens Schools.

Dkt. No. 61-20, PgID 1725-26. On June 29, 2015, Defendant Monk, in conjunction

with a letter of reprimand related to a period when he was the head coach of the high

school girls basketball team, sent Defendant Rickman an email that stated, in part:

"Since I am dealing with the conflict between me and the superintendent, . . ." Dkt.

No. 61-21, PgID 1728.

On June 28, 2015, Hotts contacted Wahlstrom with questions related to the

Anonymous Allegations and the June 2015 Board meeting. On June 30, 2015, Wahlstrom and Plaintiff drafted a press release to address Hotts' inquiries and circulated it to all Board members approximately seven hours before the Board met and evaluated Wahlstrom's performance as Superintendent. The press release included statements that: (a) the District had "received several recent inquiries about the MCB Parent Group, an organization purportedly raising funds on the District's behalf"; and (b) "the District directed MCB Parent Group to immediately cease all fundraising efforts that suggest or imply the District's or Board's approval and further directed MCB Parent Group to immediately cease using the District's name, logo, and symbols." Dkt. No. 61-23, PgID 1734. On June 30, 2015, the Board held a special meeting for the purpose of discussing Wahlstrom's performance as Superintendent. Dkt. No. 61-26, PgID 1750-52.

On July 5, 2015, an investigative article written by Hotts was published in the Macomb Daily. It was titled "Questions arise over Mount Clemens booster club headed by school board trustee." Dkt. No. 61-37, PgID 1842-44. The article published the text of the June 30, 2015 press release drafted by Wahlstrom and Plaintiff and quoted Wahlstrom as follows, "There are a number of citizens and people working with the booster club who have expressed some serious concerns about the club and we are legally obligated to look into these matters." *Id.* When Hotts asked

Defendant Monk about the Anonymous Allegations, Defendant Monk responded "talk to my attorney." *Id.* Defendant Rickman and Defendant Bruley testified that Defendant Monk was very upset when the July 5, 2015 article was published. Dkt. No. 61-10, PgID 1618; Dkt. No. 61-7, PgID 1557. At a special meeting of the Board on July 6, 2015 to vote on whether to renew the Agreement, 4 of the 7 Board members voted against the renewal of the Agreement. Wahlstrom's employment with the District terminated the first week of October 2015 (but her physical presence at the District offices concluded in early August 2015).

The Sheriff's Department investigation of Defendant Monk for embezzlement resulted in Detective O'Brien "claiming that there was insufficient evidence presented to [him] at the time of [his] investigation to charge [Defendant Monk] with that charge," Dkt. No. 61-12, PgID 1674. Plaintiff suggests this was because there were no finances or manpower to complete the investigation. Dkt. No. 61, PgID 1201. The Attorney General's office was only given Defendant Monk's own accounting records, including a profit and loss statement and a "Transaction Detail by Account." Detective O'Brien testified that he did not know if that reflected "a correct statement of the finances of the organization." Dkt. No. 61-12, PgID 1671. No bank records from the Booster Club's bank were requested. *Id.* Detective O'Brien testified that Wahlstrom and Plaintiff had "reasonable suspicions" to think there was embezzlement

and to ask the Sheriff's Department to investigate. *Id.* at PgID 1679.

In an undated response to a July 22, 2015 letter from the Attorney General's office, Defendant Monk reiterated that he thought that "the Superintendent and [an unnamed] citizen previously mentioned, have conspired to defame me, my wife and my company." Dkt. No. 60-22, PgID 2374-76. Defendant Monk admitted that all of Wahlstrom's "defamatory" and "conspiratorial" conduct occurred prior to the Board's vote regarding the renewal of Wahlstrom's employment. *Id.* at 2375.

Teresa Davis began working for the District in the fall of 2014, approximately 10 months before Defendant William Pearson did. On or before August 3, 2015, Plaintiff and Wahlstrom had complained to Defendant Rickman (as Board President) that Teresa Davis had given herself (and her team) an unauthorized raise immediately prior to a Board business committee meeting so that Teresa Davis could slip the signed contracts into the business committee's packet of documents to review and approve. Dkt. No. 60-3, PgID 1986-88. Defendant Rickman later asked Wahlstrom for copies of all salary information for employees and contracted persons in the District because of apparent "HUGE salary increases/adjustments over the past couple years." Dkt. No. 60, PGID 2495. When Plaintiff sought to fulfill this request, Teresa Davis emailed Plaintiff (and copied Wahlstrom and Defendant Rickman), stating "This is a FRIENDLY REMINDER. Stay in your lane . . . . You will not receive this

information." *Id.* at 2493. Teresa Davis then provided Wahlstrom with salary information for Plaintiff and her team but not Teresa Davis and her team. *Id.* at 2495. Plaintiff continued to complain to Wahlstrom and Defendant Rickman about the raises given to Teresa Davis and her employees and about Davis' threatening response. Wahlstrom took no action, as her employment ended in early October 2015.

Defendant Pearson began working for the District as Interim Superintendent on or about August 10, 2015. He previously had worked as a superintendent in the South Lyon school district for 20 years. Defendant Pearson also had worked as an Assistant Superintendent for Instructional Services for four years before that in South Lyon. He was a teacher for 11 years and last taught in a classroom in 1986. As a Superintendent, he had experience with budgets, having presented budgets to the finance committee and attended finance committee meetings for 22 years. Defendant Pearson was the treasurer of the Metro Bureau of Directors, and the Board was aware that Defendant Pearson had a wealth of experience as a superintendent, including putting together a budget.

Plaintiff began complaining to Defendant Pearson about the raises in Teresa Davis' department within the first two days of Pearson's employment. Pearson quickly learned of the disparity in pay between Plaintiff and Davis – and the disparity in pay between four principals – and he was angry about the differences. At a meeting

in August or September 2015 where the pay disparity issues were discussed, he said "we can't do anything about this right now" and slammed the door shut, even as Plaintiff was holding the door, and he told Plaintiff to keep her mouth shut about the salary differences. Dkt. No. 60-3, PgID 1988. Defendant Pearson told Plaintiff that he was not going to look into the reasons for the differences but that he would be sure the discrepancies were addressed in the next year – and he did offer to raise Plaintiff's salary commensurate with Teresa Davis' salary. *Id.* at 1987. Plaintiff rejected the salary offer because "it wasn't about me not making what she made, it was about not being able to staff and resource our classrooms," especially as the District had been facing large deficits that they were trying to reduce. *Id.*

On November 23, 2015, Wahlstrom (and her company, Successline, Inc.) filed a lawsuit against the Board and the individual Board members who voted against renewing an Agreement between the District and Successline, Inc. (pursuant to which Wahlstrom was the Superintendent for the District) (the "Wahlstrom Litigation"). Hotts called Plaintiff that day to ask about the Wahlstrom Litigation, and Plaintiff gave Hotts Defendant Pearson's cell phone number. Defendant Pearson talked to Hotts but did not comment because the District had not been served, and Defendant Pearson then wrote an email to the Board members, notifying them that the Wahlstrom Litigation was filed. The next week, Defendant Pearson asked Plaintiff if she was

"still friends with . . . [or] talking to" Wahlstrom. *Id.* at 2008. When Plaintiff stated that she was, Defendant Pearson stated, "I can't protect you if you're stupid. The board's not gonna like this." *Id.* Plaintiff understood Defendant Pearson to mean that it was stupid for Plaintiff to continue being Wahlstrom's friend. Plaintiff states that Defendant Pearson and most, if not all, of the Board members knew that Plaintiff was friends with Wahlstrom and that Plaintiff continued to be in contact with Wahlstrom after Wahlstrom's employment ended. *Id.* at 2008-09, 2013.

On December 16, 2015, prior to a Board meeting, a process server in the Wahlstrom Litigation sought to serve a summons and complaint on Defendant Board Members and approached Plaintiff. Plaintiff contacted Defendant Pearson. Defendant Pearson reacted by telling Plaintiff that "the board wasn't going to be happy about this and if the lawsuit went the wrong way, there was no way he could protect me. And if I was stupid, there was no way he could protect me." *Id.* at 1993. The next day, Defendant Pearson again told her that the Board was not happy. He said he could not protect her if she was stupid, and that she should "be careful" and stop talking to Wahlstrom. He claimed the Board knew she was involved in helping Wahlstrom with the lawsuit and the Board wanted her gone. *Id.* at 1995, 2010. On January 12, 2016, Defendant Pearson said to Plaintiff, "if the lawsuit go[es] the wrong way, there's nowhere you can hide. *Id.* at 2010.

On January 20, 2016, a closed session of the Board met to discuss the District's deficit elimination plan, which, as it was revealed at the meeting, involved eliminating one of the assistant superintendents. At the meeting, Defendant Pearson told Plaintiff not to write down anything, put her pad of paper on the floor, and sit with her hands in her lap before he stated to the Board, "if you want me, Renee's gone." *Id.* at 2000. According to Board member Jeanine Walker, it was the first time anyone had mentioned terminating Plaintiff. Dkt. No. 60-9, PgID 2254.

On January 25, 2016, Defendant Pearson discussed with Plaintiff his plan to have her be the principal of the high school if she was no longer an Assistant Superintendent. Dkt. No. 60-3, PgID 1995-96. Defendant Pearson told her that the Board did not like that plan, as the Board had issues with her and she knew why but that he could not tell her why because she "would use it in a lawsuit against him and the board." *Id.* at 2011; Dkt. No. 60-41, PgID 2509. Defendant Pearson said that "he should have protected [Plaintiff] better" before ultimately stating that "it's Deb. They see you as complicit in the thing with Deb." Dkt. No. 60-3, PgID 2011.

On January 25, 2016, Defendant Pearson also told Plaintiff that the Board had agreed to terminate her employment, effective at the end of the school year, as he had recommended. Dkt. No. 60-3, PgID 2012. On April 25, 2016, the Board formally laid Plaintiff off from her Assistant Superintendent position, a position the District advised

her was being eliminated, effective June 30, 2016. Dkt. No. 60-42, PgID 2512.

## III.   LEGAL STANDARD

Rule 56(a) of the Rules of Civil Procedures provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322-23. A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248.

## IV.   ANALYSIS

## A.   Applicable Law

### 1.   *Municipal Liability*

A municipal defendant can only be subject to direct liability if it causes the constitutional harm because it "implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by" that body's officers. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 (1978). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under Section 1983." *Id.* at 694. A plaintiff cannot allege a viable claim based solely on vicarious liability or *respondeat superior. Id.* at 691. The municipality's policy (or absence of one) must be a "moving force" in the deprivation of the plaintiff's constitutional rights and such policy must have arisen from "deliberate indifference" to the rights of its citizens. *Doe v. Claiborne Cty., Tenn.*, 103 F.3d 495, 508 (6th Cir. 1996).

A § 1983 claim against a municipal employee or agent for acts undertaken in

an official capacity is tantamount to a claim against the municipality that the employee or agent represents. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). A municipal liability claim against a school board must be examined by applying a two-pronged inquiry: (1) whether the plaintiff has asserted the deprivation of a constitutional right at all; and (2) whether the school board is responsible for that violation. *Doe v. Claiborne County*, 103 F.3d at 505–06.

Municipal liability may attach under Section1983 where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. Cincinnati*, 475 U.S. 469, 483–84 (1986). The "act" of the municipality may be one of sanctioning the offensive conduct. *Id.* at 480. To hold a supervisory official liable under § 1983, it must be shown that he "'at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.'" *Payton v. City of Detroit*, 536 N.W.2d 233, 245 (Mich. App. 1995) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)). A single act by a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action ordered" may suffice in demonstrating that policy or custom. *Cady v. Arenac Cty.*, 574 F.3d 334, 345 (6th Cir. 2009) (quoting *Pembaur*, 475 U.S. at 481).

## 2. *Qualified Immunity*

Qualified immunity is an affirmative defense against a Section 1983 claim. *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996). The doctrine of qualified immunity "shields 'governmental officials performing discretionary functions . . . from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). *See also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (government officials performing discretionary functions are shielded from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").

"[T]he test for qualified immunity has only two prongs—whether the defendant violated a constitutional right and whether the right at issue was clearly established." *Brown v. Lewis*, 779 F.3d 401, 417 (6th Cir. 2015) (citing *Plumhoff v. Rickard*, — U.S. —, 134 S. Ct. 2012, 2020 (2014), and *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009)). For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Creighton*, 483 U.S. at 640. This standard does not require the very action in question to have previously been held unlawful, only that its

unlawfulness be apparent in light of pre-existing law. *Id.* (citing *Mitchell* v. *Forsyth,* 472 U.S. 511, 535 n.12, (1985)).

Once a government official has raised the defense of qualified immunity, the plaintiff "bears the ultimate burden of proof to show that the individual officers are not entitled to qualified immunity." *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 494 (6th Cir. 2012) (citation omitted). A plaintiff must also establish that each individual defendant was "personally involved" in the specific constitutional violation. *See Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir. 1998); *Bennett v. Schroeder*, 99 F. App'x 707, 712-13 (6th Cir. 2004) (unpublished) ("It is well-settled that to state a cognizable Section 1983 claim, the plaintiff must allege some personal involvement by the each of the named defendants").

A school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of an individual, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to that individual. *Wood v. Strickland*, 420 U.S. 308, 322 (1975).

**B.    Section 1983 Claim**

A viable claim under Section 1983 requires a plaintiff to "identify a right

secured by the United States Constitution and the deprivation of that right by a person acting under color of state law." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992). Plaintiff has asserted that Defendants retaliated against her in violation of her rights to (a) freedom of expressive association, which is protected by the First Amendment, and (b) freedom of intimate association, a privacy interest derived from the Due Process Clause of the Fourteenth Amendment. *See, e.g., Anderson v. City of LaVergne*, 371 F.3d 879, 881 (6th Cir. 2004) (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984).

With respect to expressive association, the Supreme Court "has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts*, 468 U.S. at 618. Included as a right under the First Amendment is the right to testify in any federal court proceeding freely, fully, and truthfully without "deter[rence], by force, intimidation, or threat." See 42 U.S.C. § 1985(2); *United Broth. Of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 832 (1983) (citing 42 U.S.C. § 1985 and stating that a violation of Section 1985 may be found where a governmental entity is involved in the interference of an individual's First Amendment right); *Lindensmith v. Webb*, 2016 WL 3679505, *2 (E.D. Mich. July 12, 2016) (citing *Scott*, 463 U.S. at 830) (same).

*See also Lane v. Franks*, – U.S. –, 124 S. Ct. 2369, 2378 (2014) ("Truthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes. That is so even when the testimony relates to his public employment or concerns information learned during that employment.").

Concerning intimate association, the Supreme Court "has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Id.* at 617–18. The Supreme Court has explained that the right to intimate association "receives protection as a fundamental element of personal liberty." *Id.* at 618. Personal friendship is protected as an intimate association. *Akers*, 352 F.3d at 1039–40 (citing *Corrigan*, 55 F.3d at 1214–15). Assuming an intimate association exists, the Court's next step is to determine whether the government entity's action constituted a "direct and substantial interference" with the plaintiff's intimate association. *Anderson*, 371 F.3d at 882 (citing *Akers*, 352 F.3d at 1040). If so, the government entity's action is subject to strict scrutiny review; if not, rational basis review applies. *See id*.

1.    *First Amendment Claim*

A First Amendment "retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the

19

plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). *See also Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to demonstrate by a preponderance of the evidence that the same decision would have been reached absent the protected conduct. "Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014) (citing *Thaddeus-X*, 175 F.3d at 394).

The threshold question of whether the plaintiff engaged in a constitutionally protected activity has two components: (1) whether the plaintiff was speaking as a citizen; and (2) whether the topic was a matter of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006); *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). In *Garcetti*, the Supreme Court held that a public employee is not speaking as a citizen when he "make[s] statements pursuant to [his] official duties." 547 U.S. at 421. There, the plaintiff, a deputy district attorney, was fired for writing an internal memorandum recommending dismissal of

a case on the basis of alleged government misconduct. The Supreme Court noted that there can be First Amendment protection for expressions made at work and on the subject of the defendant's employment, but the "controlling factor" was that the plaintiff's expressions "were made pursuant to his duties as a calendar deputy." *Id.* at 420-21. After *Garcetti*, the Sixth Circuit held that a park ranger's conversations with a personnel consultant hired by the department were "ad hoc or de facto duties" of her job and therefore her statements were made as an employee and not as a citizen. *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538 (6th Cir. 2007).

In the Sixth Circuit, "[a] matter of public concern usually involves a matter of political, social, or other concern to the community." *Jackson v. City of Columbus*, 194 F.3d 737, 746 (6th Cir. 1999). When a public employee speaks as an employee on matters of personal interest, "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147 (internal citation omitted).

To establish that the at-issue constitutionally protected speech motivated the adverse action, a plaintiff must "point to specific, nonconclusory allegations reasonably linking her speech to the employer discipline." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.2d 392, 400 (6th Cir. 2010) (internal citation omitted). Mere

speculation, innuendo and rumor are insufficient to substantiate a First Amendment retaliation claim. *Buchko v. County of Monroe*, 506 Fed. Appx. 400, 404-406 (6th Cir. 2012) (citing *Vereecke*, 609 F.3d at 399-400); *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998) ("[w]hen assessing motive in the context of a summary judgment motion, bare allegations of malice [do] not suffice to establish a constitutional claim.") (internal citations omitted).

A.    Municipal Liability

Defendants assert that the Board, as an entity, and the District are the final policymakers in this case, as Defendant Pearson is not an authorized policymaker because he could only make recommendations to the Board and did not have final authority to create official policy. Citing *Pembaur*, 475 U.S. at 481. Defendants further assert that there is no evidence of an illegal official policy or legislative enactment that was followed by the Board or evidence that any individual Defendant had final authority. Citing *Burgess*, 735 F.3d at 478. Plaintiff distinguishes this case from *Burgess*, arguing that Defendants ordered illegal conduct that resulted in her injury. Defendants argue that the Board and the District are entitled to dismissal of all claims because Plaintiff has not produced any evidence of any illegal policy, order or directive of the Board. *Garner v. Memphis Police Dept.*, 8 F.3d 358, 364 (6th Cir. 1993).

Plaintiff argues that Defendant Pearson and the Board made a deliberate choice to terminate her employment, choosing to terminate her rather than one of several other options, such as "other cost saving measures" or terminating Teresa Davis. Plaintiff has not offered evidence that any of those other options were presented to the Board to consider or vote on. Plaintiff does not explain how the Board's decision to terminate her constituted the implementation of any policy, order, or directive, and there does not appear to be any evidence that the Board's decision to terminate her was connected to, or stemmed from, any policy, order, or directive of the Board or the District.

Plaintiff's argument that Defendant Pearson had final decision making authority because he "executes the dictates of the board" is misplaced. If he was executing the dictates of the Board, he was not the final decision maker. Plaintiff undercuts her argument when she states that the Board members can create municipal liability for the Board because they: (a) ratified the illegal conduct of Defendant Pearson; or (b) took illegal actions themselves by voting as composite Board members to terminate Plaintiff for her protected activity, which was "the moving force or cause of [her] harm." Citing *Pembaur*, 475 U.S. at 484-85.

The Court finds that Plaintiff has failed to establish that there was any policy, order, or directive of the District or Board that was the basis for the votes of the

individual Defendant Board members to terminate Plaintiff. The District and the Board are not liable as a matter of law. The Court grants Defendants' motion for summary judgment as it relates to the District and the Board.

### B.    Qualified Immunity

Defendants contend that there is no genuine dispute of material fact whether Defendant Pearson or the individual Board members violated a constitutional right of Plaintiff or that any constitutional right violated was clearly established at the time of their vote. Defendants state that the conduct at issue is Defendant Pearson's recommendation and the vote of the Board members to terminate Plaintiff, effective at the conclusion of the 2015/2016 school year. Defendants assert that no reasonable Board member or superintendent in the individual Defendants' positions would think it was an unreasonable action to eliminate one of two assistant superintendents. Defendants represent that the decisions were based on: (1) the District's need to lay off administrators to reduce the District's budget deficit; and (2) the fact that Plaintiff, like Defendant Pearson, had a curriculum background, essentially the same skill set. Defendants argue that because Teresa Davis, in Plaintiff's words, "sat at table and did the same things" as Plaintiff, demonstrates the sheer speculation of Plaintiff that Defendant Pearson and the Board must have retaliated against Plaintiff.

Defendants argue that Plaintiff was not engaged in constitutionally protected

activity when she: (a) tangentially participated in the investigation regarding the Anonymous Allegations at the direction of Wahlstrom and the District's attorneys; or (b) complained about Teresa Davis' pay raise. Defendants argue, and the Court finds, that Plaintiff's participation in the investigation regarding the Anonymous Allegations – reporting the issues to local law enforcement and drafting a press release on behalf of the District – was part of her official duties and were not "statements" made as a citizen. *Garcetti*, 547 U.S. at 421.

Defendants contend that Plaintiff was acting as an employee, not as a citizen on a matter of public concern, when she notified Wahlstrom and Defendant Pearson about the raises (and the process by which the raises were) given to Teresa Davis and her team. Plaintiff argues that she worked as the assistant superintendent of a public school district, so her "internal complaint" to her superintendents (Wahlstrom and Defendant Pearson) was made to a public body. Plaintiff also argues that, prior to reporting the violation to Defendant Pearson, she specifically told Defendant Rickman (as Board President) about the illegal pay raise, which constitutes advancing her complaint "to the Board." Defendants assert that such internal complaints involved a matter of personal interest, not a matter to be resolved in the courts. *Connick*, 461 U.S. at 147; *Garcetti*, 547 U.S. at 420-21; *Weisbarth, supra.*

Defendants suggest that Plaintiff has no evidence to connect her alleged

constitutionally protected activity with her termination. Defendants state that Plaintiff's uncorroborated testimony about what Defendant Pearson allegedly said to her about the Board's displeasure with the Wahlstrom Litigation and her continued friendship with Wahlstrom is insufficient given the District's need to reduce its deficit.

Plaintiff responds that the objective illegality of Defendants' conduct under Section 1983 is clear, stating that Defendant: (a) instructed her to stop being friends with Wahlstrom and then terminated her employment when she refused; and (b) told Plaintiff that she would not be protected if the Wahlstrom Litigation "goes the wrong way." Plaintiff argues that her right to freedom of intimate association and expression under the circumstances of this case were clearly established by the Supreme Court in 2014. Citing *Lane*, 124 S.Ct. at 2378 ("Truthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes. That is so even when the testimony relates to his public employment or concerns information learned during that employment."). Plaintiff asserts that she has produced evidence that Defendant Pearson and the Board members' actions were motivated by malicious intent to stop her from being friends with, and participating in the litigation of, Wahlstrom, citing *Wood v. Strickland*, 420 U.S. 308, 322 (1975), including the following comments by Defendant Pearson:

(1) that Pearson can't protect Clemens if she's stupid by maintaining a friendship with Wahlstrom, [Dkt. No. 60,] Exhibit B, Clemens Dep. at 174:24–175:11; (2) that "the board wasn't going to be happy about [being served with the Wahlstrom Litigation] and if the lawsuit went the wrong way, there was no way he could protect me. And if I was stupid, there was no way he could protect me," *id*. at 114:21–115:2; (3) warning Clemens "to be careful" and asking her to stop talking to Wahlstrom, *id*. at 121:9–22; (4) that the Board "knew I was a part of [Wahlstrom]'s lawsuit, that I was helping her in some way with her lawsuit,"; (5) that Clemens was "complicit" in the lawsuit, and that the Board "wanted me gone, [']get her out of here[']" *id*. at 121:9–22, 183:15–184:11; (6) again stating that "if the lawsuit going the wrong way, there's nowhere you can hide," *id*. at 184:12–25; and (7) stating that Clemens could not be rehired as a principal because the Board "see[s] you as complicit in the thing with Deb[."] *Id*. at 188:5–19.

Dkt. No. 60, PgID 1866-67 ("Pearson's Comments"). The Court must, for the purposes of reviewing Defendants' Motion, accept the preceding statements as true. The Court finds that there are genuine issues of material fact for a jury to decide as to whether these direct evidence statements are causally linked to Defendants' decision to terminate Clemens.

### C. Inevitability of Elimination of Plaintiff's Position

Defendants argue that, even if Plaintiff can establish a prima facie case of retaliation under Section 1983, Defendants can prove by a preponderance of evidence that her position would have been eliminated even in the absence of her alleged protected activity. Defendants cite Plaintiff's testimony that, in the fall of 2015, the District was, and had been for years, on a deficit elimination plan and that Defendant

Pearson's biggest focus was to cut the deficit. Dkt. No. 49-2, PgId 592; Dkt. No. 49-23. Defendants argue that because Defendant Pearson's background aligned much more closely with Plaintiff's (curriculum) than Teresa Davis' (financial), Plaintiff's position was eliminated but that if Defendant Pearson's background had aligned more with Davis' background, Davis' position would have been eliminated. Defendants argue that this legitimate, nondiscriminatory explanation, and the evidence that support it, would preclude any reasonable juror from returning a verdict in Plaintiff's favor, such that Defendants are entitled to judgment as a matter of law. Citing *Thaddeus-X*, 175 F.3d at 394.

Plaintiff does not directly address this argument, but her general argument that Teresa Davis' position, rather than Plaintiff's position, could have been eliminated or other cost saving measures could have been implemented, may serve to undermine Defendant's argument, creating a genuine dispute of material fact as to the accuracy of Defendant's explanation for her termination.

### D.   Conclusion

The Court finds that Plaintiff's Section 1983 claim can continue against the individual Defendants as it relates to retaliating against her for her role in the Wahlstrom Litigation and her relationship with Wahlstrom. The Court denies Defendants' motion for summary judgment on the Section 1983 claims as it relates

to those matters but grants it to the extent the Section 1983 claims are based on her role in investigating the Anonymous Allegations or complaining of the raises given to Teresa Davis and her team.

## C. Claim Pursuant to the Michigan Constitution

The District, the Board, and all of the individual Defendants sued in their personal capacities are entitled to summary judgment on Plaintiff's claim pursuant to the Michigan Constitution, as other remedies are available against such defendants. *Jones v. Powell*, 462 Mich. 329, 335-37 (2000). *See also Bennett v. Detroit Police Chief*, 274 Mich. App. 307, 315-16 n.3 (2006). Plaintiff's response does not address her claim under the Michigan Constitution. The Court grants Defendants' motion for summary judgment on, and dismisses, Plaintiff's claim under the Michigan Constitution.

## D. Conspiracy to Intimidate a Witness

42 U.S.C. §1985(2) provides for a private cause of action against individuals who act, by "force, intimidation, or threat" to obstruct justice or intimidate a party or witness to testify truthfully "in any court of the United States." The statute specifically provides:

> If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully. . . the party so injured or

> deprived may have an action for the recovery of damages occasioned by
> such injury or deprivation, against any one or more of the conspirators.

To sustain a cause of action under §1985(2), a plaintiff must prove the existence of a conspiracy among "two or more persons." *Doherty v. American Motors Corp.*, 728 F.2d 334, 339 (6th Cir. 1984). Broad conclusory language void of factual allegations is insufficient to state a claim under Section 1985(2). *Jaco v. Bloechle*, 739 F.2d 239, 245 (6th Cir. 1984). A plaintiff must allege some evidence of coordinated actions between the alleged conspirators. *Bass v. Robinson*, 167 F.3d 1041, 1050 (6th Cir. 1999).

Defendants maintain that Plaintiff has produced no evidence, only conclusory allegations, that any Board member: (a) ever discussed with Defendant Pearson her role in the Wahlstrom Litigation (such as her potential testimony); or (b) took any action to deprive of her right to testify truthfully in that case. Plaintiff argues that she has demonstrated "multiple specific instances of conspiratorial conduct." She states that her testimony reflects that Defendant Pearson "references his conversations with other co-conspirators (individuals on the Board, as well as the Board itself) related to [her] participation in the *Wahlstrom* [L]itigation and her ultimate termination (which was ratified by the Board, which is comprised of individual voting members)." As Defendants argue, there is no non-hearsay evidence of any individual other than Defendant Pearson that there was any discussion of Plaintiff's role in the Wahlstrom

Litigation. There is no evidence that any other person took any action to deprive of her right to testify truthfully in that case. Plaintiff contends that it does not matter that it is unclear which specific individual Board members Defendant Pearson spoke with, because a majority of the Board members "voted in furtherance of the conspiracy" and that he spoke with "the Board" as a whole, which is a Defendant.

The Court is not persuaded by Plaintiff's argument. "The Board" as a whole cannot speak or admit anything. At most, Plaintiff has cited Defendant Pearson's alleged statements that the Board was not pleased with Plaintiff's friendship with Wahlstrom or Plaintiff's role with respect to the Wahlstrom Litigation. No other person was identified by Defendant Pearson (in his alleged statements regarding the Board's feelings toward Plaintiff) or Plaintiff as having discussed the matter with Defendant Pearson. Plaintiff's argument is reduced to trying to use Defendant Pearson's statements to establish that he and the Board (or members of it) conspired to threaten Plaintiff's job – and terminate her – because of her relationship with Wahlstrom and alleged involvement in the Wahlstrom Litigation. That is not enough to establish a genuine dispute of material fact. The Court grants Defendants' motion as to Plaintiff's Section 1985 conspiracy claim and dismisses that claim.

**E.      Whistleblowers' Protection Act**

The Whistleblowers' Protection Act ("WPA") provides:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body . . . .

M.C.L. § 15.362. The WPA must be liberally construed in favor of the persons it was intended to benefit. *Phinney v. Perlmutter*, 222 Mich.App. 513, 546 (1997).

A plaintiff may establish a prima facie case by demonstrating that: (1) she was engaged in protected activity as defined by the Act; (2) the defendant took an adverse employment action against the plaintiff; and (3) a causal connection exists between the protected activity and the adverse employment action. *Debano-Griffin v. Lake Cty.*, 493 Mich. 167, 175 (2013). If the plaintiff can establish a prima facie case, the employer must come forward with a legitimate reason for the adverse employment action. If "the plaintiff fails to show that a reasonable fact-finder could still conclude that the plaintiff's protected activity was a 'motivating factor' for the employer's adverse action," the employer is entitled to summary judgment. *Id.* at 176 (internal citations omitted). The plaintiff must produce evidence that not only "raise[s] a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for [unlawful retaliation]." *Id.* (quoting *Hazle v. Ford Motor Co.*, 464 Mich. 456, 465-66 (2001)).

"'Protected activity' under the WPA consists of (1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation." *Chandler v. Dowell Schlumberger Inc.*, 572 N.W.2d 210, 212 (Mich. 1998). Plaintiff contends that "it cannot be disputed that Clemens engaged in protected activity by (1) participating in the investigation of the Anonymous Allegations, including by reporting the alleged illegal conduct of Defendant Board Member Monk to the Sheriff's Office and Attorney General's office, and communicating multiple times with the investigating detective; (2) reporting Teresa Davis' illegal pay raises to Wahlstrom (her former supervisor), Pearson (her subsequent supervisor), and Board President Rickman; and (3) objecting to Pearson and the Board Members' violations of her First Amendment Rights and rights under 29 U.S.C. § 1985 to testify freely in a federal lawsuit." Dkt. No. 60, PgID 1865-66.

Defendants contend that Plaintiff's internal complaint about Teresa Davis' pay was not a report of a violation (or suspected violation) of law, as Davis' contract had been signed by Wahlstrom prior to Plaintiff's complaint and no one advanced her complaint to the Board, law enforcement, or any other public body. Defendants frame her complaint as one that a similar co-worker was being paid more than her. Plaintiff does not address this argument, except to the extent she framed it in her statement of

facts as complaining about the process by which Davis got the raises.

Defendants assert that, even if Plaintiff was engaged in protected activity by participating with Wahlstrom and Teresa Davis when following instructions of their legal counsel, her WPA claim fails because: (a) it was not causally connected to her termination; and (b) she cannot rebut Defendants' legitimate, nondiscriminatory reasoning for laying her off.

Defendants suggest that there is no evidence that Defendant Pearson had knowledge of Plaintiff's alleged involvement of the investigation of the Anonymous Allegations. Defendants state that Defendant Pearson was not employed by the District when the events related to that investigation occurred (when she provided a witness statement to the Macomb County Sheriff's Department, participated in the press release, or helped with the cease and desist letter) and was not involved in any concerns regarding Defendant Monk or the District's past history. Relying on *McBrayer v. Detroit Med. Ctr.*, 2010 WL 5175458, at *3 (Mich.Ct.App. Dec. 21, 2010) ("When there is no evidence that the employer knew about protected activity at the time of the plaintiff's discharge, the requisite causal connection cannot be established."). Defendants' argument ignores that: (1) Plaintiff has testified that Defendant Pearson repeatedly commented on (and therefore knew about) Plaintiff's connection with Wahlstrom and the Wahlstrom Litigation, all of which stemmed from

the Anonymous Allegations; (2) the Board members – who Defendant Pearson allegedly indicated were criticizing Plaintiff *vis a vis* Wahlstrom and the Wahlstrom Litigation – clearly knew all about that investigation and Plaintiff's role in it; and (3) Defendant Rickman testified taht Defendant Pearson knew what the Pearson Litigation was about. Dkt. No. 60-10, PgID 2280. Defendants' knowledge argument must be rejected.

Defendants next suggest that there is no causal connection because: (a) Davis was did the same thing as her and was retained, all of which occurred long after the investigation regarding the Anonymous Allegations was complete; and (b)the decision to not file charges against Defendant Monk was made months before the decision to eliminate her position. Defendants contend that means there was no temporal or logical connection between Plaintiff's role to follow the advice of counsel in the summer of 2015 and the elimination of her position in 2016.

As described above, and the Court finds that, there is evidence of multiple comments by Defendant Pearson related to her participation in the Wahlstrom Litigation and her relationship with Wahlstrom that could be construed as retaliatory. *See* Pearson Comments, *supra* Section III.B.1.B. Plaintiff also cites numerous comments by, or occasions involving, Defendant Monk that she believes support an inference of a retaliatory motive, including:

(1) a June 16, 2015 conference call related to the Anonymous Allegations, where Defendant Monk expressed his belief that the actions taken by Wahlstrom, Plaintiff, and the District in pursuing the Anonymous Allegations against him constituted a "personal attack," Dkt. No. 60-6, PgID 2128;

(2) on June 17, 2015, when Monk stated at a Board Meeting, "[o]utside of attacks on myself, I will maintain professionalism," Dkt. No. 60-18, PgID 2363;

(3) on June 18, 2015, when Wahlstrom received a letter from Defendant Monk dated June 24, 2015, stating that District's inquiry in to the Anonymous Allegations was "an apparent personal attack" and that "the threatening undertone of" Wahlstrom's cease and desist letter "borders on defamation," Dkt. No. 60-20, PgID 2369-70;

(4) on June 30, 2015, within hours of Wahlstrom issuing a public cease and desist letter to Defendant Monk (a letter written by Wahlstrom and Clemens), when the Board met in closed session to discuss renewing the Agreement;

(5) Defendant Monk's belief that the "Superintendent and [an anonymous] citizen" wrote the Anonymous Allegations and "conspired to defame me, my wife, and my company, Dkt. No. 60-22, PgID2375; and

(6) the discussion by the Board regarding whether Wahlstrom or Plaintiff sent the Anonymous Allegations in the first place. Dkt. No. 60-10, PgID 2266-67.

As Plaintiff states, the Anonymous Allegations issue was revived in November 2015 when the Wahlstrom Litigation was filed, which was only two months before Defendant Pearson told her that she would be laid off. During those two months, he made numerous comments to her about her role in the Wahlstrom Litigation and her

relationship with Wahlstrom, and he recommended her termination to the Board at its first meeting after the Wahlstrom Litigation had been served.

Defendants close their argument regarding the WPA claim by noting that they have a legitimate, nondiscriminatory reason for terminating Plaintiff, as discussed in Section III.B.1.C. Defendants state that it was a simple decision: "the administration was overstaffed, an assistant superintendent position needed to be eliminated, Defendant Pearson could perform the duties that Plaintiff was performing, as a result, Plaintiff's position was eliminated and she was laid off." Dkt. No. 49, PgID 552-53.

Plaintiff responds that the "curriculum"-focused argument (*i.e.*, that curriculum was all she did and that Defendant Pearson's skill set was duplicative of hers) is erroneous. Plaintiff states that there is evidence that Defendant Pearson is skilled in the financial aspects of running a school district, even more so than "planning curriculum" over the last 25 years. Plaintiff notes that Defendant Pearson admitted having experience with budgets, apparently even putting the budget together in South Lyon, before coming to the District and also participated in drafting the budget for the District. Dkt. No. 60-5. PgID 2085. Defendant Pearson was the treasurer of the Metro Bureau of Directors and Defendant Rickman (the Board President) testified that he knew Pearson had a wealth of knowledge as a superintendent, including putting together a budget. Dkt. No. 60-10, PgID 2269. Conversely, the last time Pearson was

"managing" or changing curriculum for a district was between 1991-95, and he has not been in a classroom since 1985. As he admits, those four years, plus a degree from 1985, constitute the extent of his "background in curriculum." Dkt. No. 60-5, PgID 2086-87; Dkt. No. 60-43, PgID 2515-18.

As Plaintiff argues, there is evidence that Defendant Pearson could perform both Plaintiff's duties and Davis' duties, so there is a genuine issue of material fact that Defendants' proffered reason did not actually motivate the termination of Plaintiff. The Court finds that genuine issues of material fact exist whether the proffered reason for Plaintiff's termination—that Plaintiff was terminated because "Dr. Pearson could perform the duties that [Plaintiff] was performing"— was pretext for retaliation. The Court denies Defendants' motion to dismiss the WPA claim.

## F.    Michigan Public Policy Claim

A public policy claim cannot be sustained where there is an applicable statutory prohibition against discharge in retaliation for the conduct at issue. *Dudewicz v. Norris-Schmid Inc.*, 443 Mich. 68, 78-80 (1993); *Suchodolski v. Mich. Cons. Gas Co.*, 412 Mich. 692 (1982) (where the state grants a person subject to retaliation the right to sue, no claim exists for discharge in violation of public policy). As Defendant argues, Plaintiff's public policy discharge claim is based on the allegation that she "failed to and refused to violate or acquiesce in, or reported, violations of laws

governing fraud, embezzlement, conversion and health code violations, as well as other civil and criminal laws …" and that her termination was in retaliation for her "failure and refusal to violate or acquiesce in, or report, violations of law and her protected internal reporting of violations of law and regulations." Dkt. No. 1, ¶¶96-98.

The Court finds that Plaintiff's public policy discharge allegations are based on the same facts and circumstances as those she cites in support of her WPA claim: (a) her participation in the investigation of the Anonymous Allegations; (b) her relationship with Wahlstrom; and (c) her complaints regarding the pay raises given to Davis and her team. Plaintiff apparently agrees with this analysis, as her response does not address her public policy discharge claim. Accordingly, the Court dismisses Plaintiff's public policy discharge claim as a matter of law.

## V.  CONCLUSION

Accordingly,

IT IS ORDERED that Defendants' Motion for Summary Judgment [Dkt. No. 49] is **GRANTED IN PART** and **DENIED IN PART**.

IT IS FURTHER ORDERED that:

A.  Counts II, III, and V are dismissed; and

B.    Counts I and IV will proceed.

IT IS ORDERED.

S/Denise Page Hood
Denise Page Hood
Chief Judge, United States District Court

Dated:  March 30, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 30, 2018, by electronic and/or ordinary mail.

S/LaShawn R. Saulsberry
Case Manager